1  BOTTINI & BOTTINI, INC.
   Francis A. Bottini, Jr. (SBN 175783)
2  Albert Y. Chang (SBN 296065)
   Aaron P. Arnzen (SBN 218272)
3  7817 Ivanhoe Avenue, Suite 102
   La Jolla, California 92037
4  Telephone:   (858) 914-2001
   Facsimile:    (858) 914-2002
5
6  *Attorneys for Plaintiff*
7
8              **UNITED STATES DISTRICT COURT**
9             **SOUTHERN DISTRICT OF CALIFORNIA**

10  JODY WATT,                              Case No. **'24CV0867 LL    DDL**

11                              Plaintiff,
                                            **COMPLAINT FOR**
12              vs.                         **VIOLATION OF SECTION**
                                            **14(A) OF THE SECURITIES**
13  BLOCK, INC., JACK DORSEY, ROELOF        **EXCHANGE ACT OF 1934**
    BOTHA, SHARON ROTHSTEIN, MARY
14  MEEKER, RANDALL GARUTTI,                **Demand for Jury Trial**
    JAMES MCKELVEY, SHAWN "JAY-Z"
15  CARTER, AMY BROOKS, and PAUL
    DEIGHTON,
16
                                Defendants.
17
18
19
20
21
22
23
24
25
26
27
28

Complaint for Violation of the Federal Proxy Laws

Plaintiff Jody Watt ("Plaintiff"), a current shareholder of Block, Inc. ("Block" or the "Company"), by and through undersigned counsel, brings this individual action against certain present and former directors and officers of Block, Inc. for declaratory and injunctive relief to remedy false statements and omissions in the Company's proxy statements.  In support of these claims, Plaintiff alleges the following (1) upon personal knowledge with respect to the matters pertaining to Plaintiff and Plaintiff's ownership of Block stock; and (2) upon information and belief with respect to all other matters, based upon the investigation undertaken by counsel, which included, *inter alia*, a review and analysis of (a) the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) news articles, conference call transcripts, analysts' reports, and press releases; and (c) other publicly available information pertaining to Block and the topics addressed herein.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is an individual, direct action for declaratory and injunctive relief to remedy false statements and omissions in the Company's 2024 Proxy Statement.

2.    Block filed its 2024 Proxy Statement with the SEC and disseminated the proxy along with its Annual Report to shareholders, including Plaintiff, on April 26, 2024.  The Proxy states that ***Block currently intends to hold its annual shareholder meeting on June 18***, ***2024***.

3.    In the 2024 Proxy, Defendants touted the success and importance of the Company's Cash App product.  Cash App has become one of two primary business lines for Block, and the Company has a separate CEO for Cash App — Brian Grassadonia.

4.    Block was founded by Jack Dorsey, who also founded Twitter.

1



Jack Dorsey in 2021

5.     Customers of Cash App can instantly send and receive money among themselves, and buy stocks and Bitcoin.  They can also spend or withdraw funds using Cash Card, a prepaid Visa debit card.  Cash App has grown from a small part of Block's business to its primary profit engine, accounting for $4.3 billion out of the Company's $7.5 billion in total profits in 2023.

6.     As of September 2023, Cash App had 55 million active accounts and generated $239 billion of inflows during the prior four quarters, the Company said.  Cash App is so popular it has been referenced in hundreds of rap songs, sometimes in connection with illegal activities.

7.     For the full year ending December 31, 2023, Block generated revenue of $14,681,686,000 from Cash App, an increase of over $3.6 billion, or 33%, from the prior year.

***Cash App Results***

The following tables provide a summary of the revenue and gross profit for Block's Cash App segment for the year ended December 31, 2023 and 2022 (in thousands, except for percentages):

2

Complaint for Violation of the Federal Proxy Laws

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2023** | **2022** | **$ Change** | **% Change** |
| Segment net revenue | $14,681,686 | $11,031,804 | $3,649,882 | 33 % |
| Segment cost of revenue | 10,358,223 | 7,786,760 | 2,571,463 | 33 % |
| Segment gross profit | $ 4,323,463 | $ 3,245,044 | $1,078,419 | 33 % |

8.    The Proxy also represents that the Audit and Risk Committee, consisting of Defendants Botha, Deighton, and non-parties Walker, Narula and Summers, were responsible for ensuring that the Company had adequate internal controls in place and that the Company had in place effective controls.

9.    The Proxy also states that:

Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization. The oversight responsibility of our board of directors and its committees is supported by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meet with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures, and escalate potential issues to our audit and risk committee or board of directors, as appropriate.[1]

10.    Along with the Proxy Statement, Block sent its shareholders a copy of the Company's Annual Report to Shareholders, which it filed with the SEC and sent to all shareholders on April 26, 2024.    The Annual Report represented to

---

[1] *Id*. at p. 10.

3

Complaint for Violation of the Federal Proxy Laws

shareholders that Block's internal controls over financial reporting were effective in all respects as of December 31, 2023:

**Opinion on Internal Control Over Financial Reporting**

We have audited Block, Inc.'s internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Block, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2023, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2023 and 2022, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity and cash flows for each of the three years ended December 31, 2023, and the related notes and our report dated February 22, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists,

4

Complaint for Violation of the Federal Proxy Laws

testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

/s/ Ernst & Young LLP
San Francisco, California

February 22, 2024[2]

11.     The Annual Report also stated:

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). ***Our management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria established in*** "***Internal Control — Integrated Framework***" (***2013***) ***issued by the Committee of Sponsoring Organizations of the Treadway Commission*** ("***COSO***"). ***Based on that assessment***, ***our management has concluded that our internal control over financial reporting was effective as of December 31***, ***2023***. The effectiveness of our internal control over financial reporting as of December 31, 2023 has been audited by Ernst & Young, LLP, an independent registered public accounting firm, as stated in their report which appears herein.[3]

12.     The Proxy is false and misleading and contains material omissions. Among other things, it fails to disclose that there are in fact material deficiencies in the Company's internal controls over risks plaguing Cash App, including the fact that the Cash App program has no effective procedure to establish the identity of its customers, resulting in it engaging in transactions with entities under sanction by

---

[2] *See* Annual Report to Shareholders at p. 91.

[3] *See* Annual Report at p. 151.

5

Complaint for Violation of the Federal Proxy Laws

1   the Treasury Department's Office of Foreign Assets Control, operations known to
2   sell personal information and credit card data for illegal purposes, and off shore
3   gambling sites barred to U.S. citizens.

4   13.   In addition, the Proxy fails to disclose material facts about the sudden
5   and unexpected resignation of Director Summers from the Board of Directors.  On
6   February 9, 2024, Block filed a Form 8-K with the SEC which announced that
7   "Larry Summers informed Block, Inc. (the 'Company') that he is resigning as a
8   member of the board of directors of the Company (the "Board"), effective
9   immediately, in order to devote more time to his other professional and personal
10  commitments."

11  14.   One week later, on February 16, 2024, it was disclosed that multiple
12  federal financial regulators are exploring allegations by two whistleblowers that
13  Block lacked adequate internal controls to prevent Cash App from being used for
14  unlawful purposes, including but not limited to money laundering.

15  15.   Block's Proxy Statement does not provide any facts or information
16  about Director Summers' unexpected resignation from the Board.  Instead, it simply
17  states that "Dr. Summers served on our audit and risk committee throughout 2023
18  until his departure from our board of directors in February 2024."  *See* 2024 Proxy
19  at p. 6.  Given Summers' important role on Block's Audit and Risk Committee and
20  his sudden departure just weeks before it was announced that multiple financial
21  regulators are investigating allegations that Block lacks adequate internal controls
22  to prevent Cash App from being used for money laundering, Block needs to
23  disclose more information in the Proxy regarding these matters.  A reasonable
24  inference, given Summers' designation as a "financial expert" on Block's Board
25  and his role on the Audit & Risk Committee, together with the temporal proximity
26  between his resignation and disclosure of the federal investigations into Cash App
27  being used for unlawful purposes, is that Summers learned of the material

28

6

Complaint for Violation of the Federal Proxy Laws

deficiencies in Block's internal controls and wanted to resign in an attempt to avoid liability and/or protect his reputation before the full extent of the problems became known.  Another reasonable inference is that Summers had a material disagreement with Block's management over these issues that was not reconciled, causing Summers to resign.  Any board resignations motivated in whole or part by disagreements with management over internal controls or financial reporting must be disclosed by public companies.

16.   The Proxy also seeks re-election of Block's directors based on their alleged success in providing effective oversight of management and implementing effective internal controls to protect Block against its key enterprise risks.

17.   The 2024 Proxy also represents to shareholders that the Company's compensation policies were designed and implemented with careful controls to discourage excessive risk-taking by the Company's executives that could expose the Company to significant potential liability.  The Proxy states:

> Our management team and our compensation committee each play a role in evaluating and mitigating any risk that may exist relating to our compensation programs, policies and practices for all employees, including our named executive officers. In connection with their oversight, Compensia and management conducted a risk review of our employee compensation plans and arrangements in which our employees (including our named executive officers) participate to determine whether these plans and arrangements have any features that might create undue risks or encourage unnecessary and excessive risk taking that could threaten our value.[4]

18.   The Proxy also states that "Based on our review, we have concluded that any potential risks arising from our employee compensation programs, policies

---

[4] 2024 Proxy at p. 32.

Complaint for Violation of the Federal Proxy Laws

and practices, including our executive compensation program, are not reasonably likely to have a material adverse effect on Block."[5]

19.    As these facts demonstrate, the 2024 Proxy is false and misleading and shareholders are not being provided with full and complete information necessary to cast an informed vote at Block's 2024 Annual Meeting.  As a result, Plaintiff seeks injunctive relief to force Block to make corrective disclosures and to postpone the 2024 Annual Meeting until such additional disclosures are provided.

## II.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.    This Court has jurisdiction over Defendants.  Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.  Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.  The Court has jurisdiction over Block because Block conducts substantial operations in this District.  Block does not have any headquarters and

---

[5] *Id.*

Complaint for Violation of the Federal Proxy Laws

conducts its business operations through a "distributed work model."[6]

22.    Venue is proper in this District in accordance with Section 27 of the Exchange Act.   Venue is also proper under 28 U.S.C. § 1391(b) because: (i) a substantial portion of the transactions and wrongs complained of in this complaint occurred in this District; (ii) a substantial number of Block's shareholders entitled to vote at the 2024 Annual Meeting reside within this District; and (iii) Defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had effects in this District.

### III.    PARTIES

#### A.    Plaintiff

23.    Plaintiff is a current Block shareholder, has owned Block stock at all relevant times, and has the right to vote on the matters submitted to shareholders at the 2024 annual meeting.

#### B.    Defendant Block, Inc.

24.    Defendant Block, Inc. is a Delaware corporation which has not designated a headquarters and represents in its Annual Report that it has adopted a distributed work model.   Block is comprised of two reportable segments, Square and Cash App. Square is a commerce ecosystem that helps sellers start, run, and grow their businesses, including enabling sellers to accept card payments, provide reporting and analytics, and facilitating next-day settlement.   Square's point-of-sale software and other business services help sellers manage inventory, locations, and employees; access financial services; engage buyers; build a website or online store; and grow sales.   Cash App is an ecosystem of financial products and services

---

[6] *See* Block's Annual Report filed April 26, 2024: "We do not designate a headquarters location as we have adopted a distributed work model."   Annual Report at p. 61.

Complaint for Violation of the Federal Proxy Laws

to help individuals manage their money by providing financial tools that allow individuals to store, send, receive, spend, save and invest their money. Block's securities trade on the NYSE under the ticker symbol "SQ."

### C.   The Individual Defendants

25.    Defendant Jack Dorsey is the Founder, Chairman and Chief Executive Officer ("CEO") of Block.    Dorsey is responsible for Block's day-to-day operations, as well as the overall direction and product strategy of the Company, and is a controlling stockholder with ownership of stock and proxies for stock representing 41.7% of Block's voting power.  Dorsey is a citizen of California.

26.    Defendant Roelof Botha is a director of Block and has served as a member of the board of directors since January 2011 and as Block's Lead Independent Director since June 2022.  Since January 2003, Mr. Botha has served in various positions at Sequoia Capital, a venture capital firm, including as a Senior Steward and as a Managing Member of Sequoia Capital Operations, LLC.  From 2000 to 2003, Mr. Botha served in various positions at PayPal Holdings, Inc., including as Chief Financial Officer.  Mr. Botha serves on the boards of directors of 23andMe Holding Co., Natera, Inc., MongoDB, Inc., Unity Software Inc.  Botha is a citizen of California.

27.    Defendant Sharon Rothstein is a director of Block and has served as a member of the board of directors since January 2022.  Since October 2018, Ms. Rothstein has served as an Operating Partner at Stripes, LLC ("Stripes"), a growth equity firm. Prior to joining Stripes, Ms. Rothstein served as Executive Vice President at Starbucks Corporation ("Starbucks") from April 2013 to February 2018.  Ms. Rothstein serves on the boards of directors of Yelp Inc., InterContinental Hotels Group PLC and a number of privately held companies. She previously served on the board of directors of Afterpay Limited from June 2020 until its acquisition by Block in 2022.

Complaint for Violation of the Federal Proxy Laws

28.     Defendant Mary Meeker is a director of Block and has served as a member of the board of directors since June 2011. Since January 2019, Ms. Meeker has served as a General Partner of Bond Capital. From December 2010 to December 2018, Ms. Meeker served as a General Partner of Kleiner Perkins Caufield & Byers.  From 1991 to 2010, Ms. Meeker served as Managing Director and Research Analyst with Morgan Stanley.  Ms. Meeker previously served on the boards of directors of LendingClub Corporation, from June 2012 to June 2019, and DocuSign, Inc., from July 2012 to June 2019, and currently serves on the boards of directors of Nextdoor Holdings, Inc. and a number of privately held companies.

29.     Defendant Randall Garutti is a director of Block and has served as a member of the board of directors since July 2017.  Since April 2012, Mr. Garutti has served as Chief Executive Officer and on the board of directors of Shake Shack, Inc.

30.     Defendant James McKelvey is a director and co-founder of Block and has served as a member of the board of directors since July 2009.  Since March 2012, Mr. McKelvey has served in various positions at Mira Smart Conferencing, Inc., a digital conferencing company.  Mr. McKelvey previously served on the boards of directors of MoneyonMobile, Inc. from May 2016 to August 2018 and Ajax I Holdings, Inc. from October 2020 to August 2021, and serves on the boards of directors of a number of privately held companies, as well as the Federal Reserve Bank of St. Louis.

31.     Defendant Shawn "Jay-Z" Carter is a director of Block and has served as a member of the board of directors since May 2021.  Known professionally as Jay-Z, Mr. Carter is a musician, songwriter, record executive, producer and entrepreneur.  He has served as the co-founder and majority owner of Roc Nation LLC and founder of Marcy Media LLC, a full-service agency and entertainment company, since 2008 and co-founder and Manager of Marcy Venture Partners, L.P.,

Complaint for Violation of the Federal Proxy Laws

a venture capital and private equity firm, since March 2019.  Mr. Carter founded TIDAL, which is now majority owned by Block, in March 2015, and remains a shareholder and artist of the music streaming service. Since 2014, Mr. Carter has served as the co-founder, Manager and board member of Ace of Spades Holdings, LLC, a luxury champagne company, and serves on the boards of directors of a number of privately held companies.  Carter is a citizen of California.

32.    Defendant Amy Brooks is a director of Block and has served as a member of the board of directors since October 2019.  Since November 2017, Ms. Brooks has served as President, Team Marketing & Business Operations and Chief Innovation Officer at the National Basketball Association, after serving as Executive Vice President from May 2014 to November 2017 and Senior Vice President from January 2010 to May 2014.

33.    Defendant Paul Deighton is a director of Block and has served as a member of the board of directors since May 2016.  Mr. Deighton has served as the non-executive Chairperson of The Economist Group since July 2018 and of Heathrow Airport Holdings Limited, the owner of Heathrow Airport in the United Kingdom, since June 2016. From December 2012 to May 2015, Mr. Deighton served as Commercial Secretary to the Treasury and as a member of the House of Lords in the United Kingdom. Mr. Deighton previously held various roles at Goldman Sachs.

34.    Defendants Dorsey, Deighton, Brooks, Carter, McKelvey, Garutti, Rothstein, Meeker, and Botha are collectively referred to as the "Individual Defendants." The Individual Defendants and Block, Inc. are referred to as the "Defendants."

**D.    Non-Parties**

35.    Non-party Lawrence Summers served as a member of Block's board of directors from June 2011 to February 9, 2024. Since January 2011, Summers has

Complaint for Violation of the Federal Proxy Laws

served as a professor at Harvard.  From January 2009 to December 2010, Summers served as Director of the National Economic Council for President Obama. Summers has also served as Secretary of the Treasury and Vice President of Development Economics and Chief Economist of the World Bank. Summers previously served on the board of directors of LendingClub Corporation from December 2012 to June 2018, and currently serves as the Chairperson of the International Advisory Board at Santander Bank and on the boards of directors of Skillsoft Corp. and Doma Holdings, Inc.

## IV.    FACTUAL ALLEGATIONS

### A.    Block's Cash App Segment Has Become One of the Two Primary Businesses of the Company, But Is Subject to Scrutiny and Regulation

36.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's operations, business, products, management, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue.  The Individual Defendants' misrepresentations and omissions with respect to the Company's proxy statements violated these specific requirements and obligations.

37.    In recent years, investors have become increasingly focused on the extent to which Block is in compliance with federal and state laws governing its financial operations, including laws prohibiting money laundering.  Failure to comply with such laws risks substantial fines, penalties, and civil judgments.

38.    Since being rolled out in 2013, Cash App has been significantly

Complaint for Violation of the Federal Proxy Laws

expanded and now amounts to over 67% of the Company's total revenues.[7]

39.     As a financial product, Cash App is subject to significant federal and state regulations and/or rules.

40.     In its Form 10-K filed on February 22, 2024, Block stated:

**Payments Regulation**

Various laws and regulations govern the payments industry in the United States and globally. For example, certain jurisdictions in the United States require a license to offer money transmission services, such as Cash App's peer-to-peer payments, and we maintain a license in each of those jurisdictions and comply with new license requirements as they arise. We are also registered as a "Money Services Business" with the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"). These licenses and registrations subject us, among other things, to record-keeping requirements, reporting requirements, bonding requirements, limitations on the investment of customer funds, and examination by state and federal regulatory agencies.[8]

Outside the United States, we provide localized versions of some of our services to customers, including through various foreign subsidiaries. The activities of those non-U.S. entities are, or may be, supervised by regulatory authorities in the jurisdictions in which they operate. For instance, we hold an Australian Financial Services License issued by the Australian Securities and Investments Commission to provide non-cash payments in Australia, and we are licensed as an Electronic Money Institution to provide payments services and electronic money in the United Kingdom by the Financial Conduct Authority and in the European Union by the Central Bank of Ireland and the Bank of Lithuania. Our payments services may be or become subject to regulation by other authorities, and the laws and regulations applicable to the payments industry in any given jurisdiction are always subject to interpretation and change.

---

[7] *See* Annual Report to Shareholders, filed Apr. 26, 2024, at p. 148.

[8] *See* Form 10-K at p. 10.

Complaint for Violation of the Federal Proxy Laws

**Consumer Protection**

The Consumer Financial Protection Bureau and other federal, local, state, and foreign regulatory and law enforcement agencies regulate financial products and enforce consumer protection laws, including those applicable to credit, deposit, and payments services, and other similar services. These agencies have broad consumer protection mandates, and they promulgate, interpret, and enforce rules and regulations that affect our business.

**Anti-Money Laundering, Anti-Corruption, and Sanctions**

We are subject to anti-money laundering ("AML"), anti-corruption, and economic, trade and sanctions laws and regulations in the United States and other jurisdictions in which we operate. The anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act, generally prohibit companies from making or offering improper payments to foreign government officials and political figures for the purpose of obtaining or retaining business or to gain an unfair business advantage. Economic and trade sanctions programs that are administered by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities prohibit or restrict transactions to or from, or dealings with, specified countries, governments, individuals and entities that are specially designated nationals of those countries, including narcotics traffickers and terrorists or terrorist organizations. We have implemented an AML program designed to comply with the laws and regulations to which we are subject.

**Bank Regulation**

We obtained approval from the Federal Deposit Insurance Corporation ("FDIC") and the Utah Department of Financial Institutions to open an ILC. The opening of Square Financial Services, Inc., our ILC, in March 2021 subjects us to direct state and federal regulatory supervision and requires compliance with applicable banking regulations and requirements.[9]

---

[9] *Id.*

Complaint for Violation of the Federal Proxy Laws

41.   The Annual Report also disclosed that Block had received a CID from the CFPB:

> ***The Company received Civil Investigative Demands*** ("***CIDs***") ***from the Consumer Financial Protection Bureau*** ("***CFPB***"), ***as well as subpoenas from Attorneys General from multiple states***, ***seeking the production of information related to, among other things***, ***Cash App***'***s handling of customer complaints and disputes***.  In December 2023, the CFPB notified the Company, pursuant to the CFPB's discretionary Notice and Opportunity to Respond and Advise ("NORA") process, that ***the CFPB***'***s Office of Enforcement is considering recommending that the CFPB take legal action against the Company related to the topics addressed in its CIDs***.  The purpose of a NORA is to provide a party being investigated an opportunity to present its position to the CFPB before an enforcement action may be recommended or commenced.  The Company is unable to predict the likely outcome of this matter and cannot provide any assurance that the CFPB will not ultimately take legal action against the Company or that the outcome of any such action, if brought, will not have a material adverse effect on the Company.  The Company is cooperating with the CFPB and the state Attorneys General in connection with these inquiries.
>
> The Company has accrued a liability for an estimated amount in connection with these CIDs in accordance with ASC 450-20, Contingencies: Loss Contingencies. The accrued amount was not material as of December 31, 2023. Given the status of these matters, it is not possible to reliably determine the range of potential liability in excess of the accrued amounts that could result from these investigations. The Company regularly assesses the likelihood of adverse outcomes resulting from litigation and regulatory proceedings and adjusts the financial statements based on such assessments. The eventual outcome of these matters may differ materially from the estimates the Company has currently accrued in the financial statements.[10]

---

[10] Form 10-K at p. 146.

Complaint for Violation of the Federal Proxy Laws

**B.    Defendants Have Caused Block to File a Materially False and Misleading Proxy Statement for the Upcoming 2024 Annual Meeting**

42.    On April 26, 2024, Block filed its annual proxy statement on Form 14A with the SEC, and distributed the proxy statement along with its Annual Report to its shareholders, including Plaintiff.  The Proxy Statement was approved and signed by each of the Individual Defendants.

43.    The 2024 Proxy Statement is materially false and misleading because it makes misrepresentations and omissions regarding the extent to which Block is taking adequate steps to comply with federal and state laws regulating its operations and the risks to the Company from failing to do so.

44.    The Proxy also seeks re-election of Block's directors based on their alleged success in providing effective oversight of management and implementing effective internal controls to protect Block against its key enterprise risks.

45.    As demonstrated more particularly *infra*, these statements are false and misleading.

46.    The 2024 Proxy Statement also solicits Plaintiff to vote in favor of the election of two Company directors.  The following directors have been nominated for election at the 2024 annual meeting:

    a.    Mary Meeker

    b.    Randall Garutti

47.    Because Block has a staggered Board, the remaining directors are continuing in office in 2024 and are not up for re-election.  With respect to the director nominees and their essential role in managing the key enterprise risks at Block, the Proxy stated that:

    "Our board of directors recognizes the oversight of risk management

17

Complaint for Violation of the Federal Proxy Laws

as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization."[11]

48.     In addition, the Proxy represents that the Company's directors have substantial legal and compliance experience that is allegedly valuable to the Company to help assure its compliance with applicable laws and the Company's own policies.  For example, the Proxy stressed that "Mr. Dorsey is best positioned to . . . identify key areas of risk for the company."[12]  It also trumpets Mr. Botha's experience as a financial expert who serves on several other Audit Committees in addition to Block's Audit Committee, stating: "As a seasoned director with extensive experience in the financial technology industry, Mr. Botha has played an essential role in advising our senior management in key strategic areas and has provided independent oversight in his roles as a member of both our audit and risk committee and our compensation committee, and our board of directors believes that he is a strong, independent and effective Lead Independent Director."[13]

49.     The Proxy also represents that the Audit Committee members are responsible for "reviewing the adequacy and effectiveness of our disclosure controls and procedures" but fails to provide any specific information about how the Audit Committee members are allegedly fulfilling such responsibilities.  As opposed to most public company's proxy statements that provide detailed information about the kind of information the Audit Committee receives from management, how regularly the audit committee meets, and other pertinent details, Block's proxy statement is completely silent on these issues.  It does not even

---

[11] *See* 2024 Proxy at 10.

[12] *Id.* at 4.

[13] *Id.* at 5.

18

Complaint for Violation of the Federal Proxy Laws

identify how many meetings the Audit and Risk Committee had in 2023.

50.     Further, while telling shareholders that the Board is responsible for identifying the key enterprise risks facing the Company and adopting and implementing internal controls to mitigate such risks, the 2024 Proxy is silent and woefully inadequate as to its disclosure of the Company's enterprise risks.  It does not even list what the key enterprise risks are, how many times the Audit & Risk Committee met in 2023 and what, if anything, the Audit and Risk Committee has done to mitigate such risks.  Instead, the Proxy merely states in a completely conclusory fashion that:

> Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization. The oversight responsibility of our board of directors and its committees is supported by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meet with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures, and escalate potential issues to our audit and risk committee or board of directors, as appropriate. As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors.  Oversight of the ERA is supported and enabled by our audit and risk committee.  Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and

Complaint for Violation of the Federal Proxy Laws

mitigation. [14]

51.     These disclosures regarding Block's ERA program are totally inadequate and boilerplate.  They contain absolutely no disclosure regarding what the key enterprise risks are at Block, what kind of reports the Audit & Risk Committee receives, what mitigation efforts Block has adopted to address and prevent the risks, or any other information that would allow shareholders to meaningfully assess whether the Audit & Risk Committee is adequately fulfilling its key oversight responsibility with respect to the Company's enterprise risks.  The 2024 Proxy's generic and boilerplate disclosures about enterprise risks do nothing to inform shareholders about this key area and the specific enterprise risks facing Block.

52.     The deficiency of the 2024 Proxy in this area is evident when one compares Block's cursory and inadequate disclosures with those of other companies in its field.  For example, Block identifies PayPal Holdings, Coinbase Global, Fiserv, Intuit, Global Payments, eBay, Twilio, Adobe, Shopify, and ServiceNow as "peer group companies," signifying that Block considers them comparable in significant respects, including among other things "similar industry, geography and financial characteristics as us."[15]  Among other things, Block analyzes the compensation of these companies to determine whether its compensation is competitive.[16]    Those companies provide much more detailed and fulsome disclosures in their proxy statements about their key enterprise risks and mitigation efforts.

---

[14] *Id*. at 10.

[15] *See* 2024 Proxy at p. 26.

[16] *See* 2024 Proxy at p. 26.

Complaint for Violation of the Federal Proxy Laws

53.     The deficiencies of Block's 2024 Proxy are particularly acute in light of the recent news that whistleblowers have come forward alleging that Block lacks effective internal controls regarding Cash App and that federal regulators are investigating the inadequacy of Block's internal controls designed to prevent unlawful activity, including money laundering.  Shareholders need additional information in order to assess whether the directors are fulfilling their oversight obligation and whether the Company's outside auditor (whose retention is also up for approval by the shareholders at the 2024 Annual Meeting) is adequately performing its responsibilities in this area.

54.     The 2024 Proxy also contains material omissions with respect to its fleeting reference to the sudden and unexpected resignation of former Treasury Secretary Larry Summers from Block's Board.  The Proxy merely states that "Dr. Summers served on our audit and risk committee throughout 2023 until his departure from our board of directors in February 2024."[17]

**C.     Reasons Why the 2024 Proxy Is False and Misleading**

55.     The Proxy is false and misleading because it fails to disclose that there are in fact material deficiencies in the Company's internal controls over risks plaguing Cash App, including the fact that Cash App has no effective procedure to establish the identity of its customers, causing Cash App to facilitate transactions with entities under sanction by the Treasury Department's Office of Foreign Assets Control, operations known to sell personal information and credit card data for illegal purposes, and off shore gambling sites barred to U.S. citizens.

56.     On ***February 9***, ***2024***, Director Summers unexpectedly resigned from Block's Board of Directors, effective immediately.

---

[17] *See* 2024 Proxy at p. 6.

Complaint for Violation of the Federal Proxy Laws



Summers resigned "effective immediately" on 2/9/24

57.    One week later, on February 16, 2024, it was disclosed that multiple federal financial regulators are exploring allegations by two whistleblowers that Block lacked adequate internal controls to prevent Cash App from being used for unlawful purposes, including but not limited to money laundering.  *See*, *e.g.*, Gretchen Morgenson, "Federal Regulators are Probing Whether Cash App Leaves Door Open to Money Launderers, Terrorists," NBC NEWS, Feb. 16, 2024.  The article noted that the former Block employees claim that Block "performed inadequate due diligence on customers, potentially opening the door to money laundering, terrorism financing and other illegal activities."

58.    While banks are required to know the true identity of every customer, the Cash App program "had no effective procedure to establish the identity of its customers," the whistleblowers said. In their complaints, which were reviewed by NBC News, the whistleblowers detail an array of questionable Cash App transactions with entities under sanction by the Treasury Department's Office of Foreign Assets Control.

Complaint for Violation of the Federal Proxy Laws

59. The whistleblowers filed their complaint with the Financial Crimes Enforcement Network, or FinCEN, a unit of the U.S. Treasury that administers the Bank Secrecy Act and analyzes financial transactions to combat money laundering, terrorist financing and other illicit activities. Early last month, FinCEN officials spoke at length with the whistleblowers, their lawyer told NBC News, and said they were referring the complaint to internal investigators as well as to other federal agencies.[18]

60. The February 16, 2024, article also noted that "NBC News interviewed the whistleblowers, who are knowledgeable on financial services compliance issues."

61. The whistleblowers' allegations cover 2016 through 2022 and describe "a shadow financial system beyond the reach of regulators" where *due diligence on Cash App's users was negligible and often did not adhere to sound banking practices and rules*. In addition, *Cash App's use of different institutions providing services for users prevents bank regulators from seeing the full scope of the transactions at the institutions they monitor*, the submissions say. The siloed structure of the Cash App machine, the whistleblowers say, "misdirects the attention of regulators."[19]

62. "*Lax due diligence on Cash App customers poses risks for shareholders of its parent*, *Block Inc*., the enormous fintech founded by Jack Dorsey, co-founder of Twitter," the whistleblowers said. *Block shareholders "have not been fully advised of the risks associated with the Cash App business*,"

---

[18] *See* Gretchen Morgenson, "Federal Regulators are Probing Whether Cash App Leaves Door Open to Money Launderers, Terrorists," NBC NEWS, Feb. 16, 2024.

[19] *Id*.

Complaint for Violation of the Federal Proxy Laws

1  the whistleblowers also stated.

2      63.    Block's Proxy Statement does not provide any facts or information

3  about Director Summers' sudden and unexpected resignation from the Board.

4  Instead, it simply states that "Dr. Summers served on our audit and risk committee

5  throughout 2023 until his departure from our board of directors in February

6  2024."[20]  Given Summers important role on Block's Audit and Risk Committee and

7  his sudden departure just one week before it was announced that financial

8  regulators are investigating allegations that Block lacks adequate internal controls

9  to prevent Cash App from being used for money laundering, Block needs to

10  disclose more information in the Proxy regarding these matters.  A reasonable

11  inference, given Summers' designation as a "financial expert" on Block's Board

12  and his role on the Audit & Risk Committee, together with the temporal proximity

13  between his resignation and disclosure of the federal investigations into Cash App

14  being used for unlawful purposes, is that Summers learned of the material

15  deficiencies in Block's internal controls and wanted to resign in an attempt to avoid

16  liability and/or protect his reputation before the full extent of the problems became

17  known.  Another reasonable inference is that Summers had a material disagreement

18  with Block's management over these issues that was not reconciled, causing

19  Summers to resign.  Any board resignations motivated in whole or part by

20  disagreements with management over internal controls or financial reporting must

21  be disclosed by public companies.

22      64.    In 2016, Cash App began working with Lincoln Savings Bank to

23  handle customers' deposits into their accounts. Lincoln, which opened in 1902 as a

24  one-branch agricultural bank in Iowa, is now a fintech pioneer with $1.8 billion in

---

[20] *See* 2024 Proxy at p. 6.

Complaint for Violation of the Federal Proxy Laws

1   assets. Its LSB Financial Technologies unit offers virtual cards, mobile wallets and

2   payment processing and "has created processes to allow for something unusual in

3   banking — speed."

4        65.    Working with Cash App, Lincoln Savings Bank opened a pooled

5   account where Cash App participants' money was deposited and held briefly until it

6   was transferred by Marqeta[21] to Sutton Bank for Cash Card use or to Wells Fargo.

7   When Cash App customers want to spend funds or withdraw money at an ATM,

8   their Cash Cards are loaded with money from their Cash App account.  At all other

9   times, the Cash Card has a zero balance, Sutton Bank says.[22]

10        66.    This setup meant that neither Lincoln Savings Bank nor Sutton Bank

11   could monitor both the people sending the money and those withdrawing it, the

12   whistleblowers explained. Lincoln only saw the incoming money while Sutton

13   watched it exit.  Cash App and Marqeta, neither of them banks, have views of the

14   entire transactions, the whistleblowers said.[23]

15        67.    In the rush to attract Cash App users, neither Cash App nor Lincoln

16   performed extensive due diligence on customers, the whistleblowers contend. For

17   example, Cash App allowed access to the Lincoln pooled bank account for

18   customers presenting just an email address or a phone number, the complaint said,

19

20   [21] Marqeta, based in Oakland, California, creates digital payment technologies and

21   provides issuer processor and card manager services. It launched its platform

22   publicly in 2014, and Marqeta issued shares to the public in 2021 at $27 each.
Today the company's stock trades around $5.90 (Nasdaq: MQ).

23   [22] *Id.*

24   [23] Block is Marqeta's largest customer, generating 72% of Marqeta's net revenue

25   during the first nine months of 2023, regulatory filings show. For the first nine
months of 2023, 77% of Marqeta payment transactions went through Sutton Bank.

26

27

28

Complaint for Violation of the Federal Proxy Laws

and Lincoln "had no effective procedure to establish the identity of its customers." Under traditional due diligence programs, federal banking regulations require a bank to obtain a customer's name, date of birth, home address, and full Social Security number or other identification number.

68.     Further, in 2018, Cash App began offering transactions in bitcoin, opening the app's flawed customer due diligence to terrorist financing worldwide, the whistleblowers said.

69.     On May 2, 2024, additional details were published about the ongoing federal investigations of Block.  A former Block employee has claimed that Block "processed cryptocurrency transactions for terrorist groups, and that Square performed thousands of unreported transactions in countries under U.S. government sanctions."  *See* Wesley Grant, "Block Faces Scrutiny Over Compliance Lapses at Cash App, Square," PAYMENTS JOURNAL, May 2, 2024, available at https://www.paymentsjournal.com/block-faces-scrutiny-over-compliance-lapses-at-cash-app-square/.

70.     The article noted that "***Roughly 100 pages of documents were provided to back the former employee****'s assertions.* ***The whistleblower alleges Block has a far-reaching and longstanding history of compliance negligence****. **This culture of noncompliance is attributed directly to poor leadership and extends to both of Block's brands***, ***Square and Cash App***."

71.     The Block whistleblower was quoted as telling NBC News that: "***From the ground up***, ***everything in the compliance section was flawed***.  ***It is led by people who should not be in charge of a regulated compliance program***."[24]

---

[24] *See* Wesley Grant, "Block Faces Scrutiny Over Compliance Lapses at Cash App, Square," PAYMENTS JOURNAL, May 2, 2024.

Complaint for Violation of the Federal Proxy Laws

72.   The May 2, 2024 article about the former Block employee's allegations also noted the following:

> The foreign transactions included credit card transactions, dollar transfers, and bitcoin exchanges that were not reported to the government. *These transactions*, *often in small amounts*, *were processed in countries like Russia*, *Iran*, *and Cuba*, *where they are prohibited by law*.
>
> The claims allege that *Block's leadership was made aware of these transfers but took no action. Even after the company received alerts flagging users in sanctioned countries*, *these users were allowed to operate unimpeded*.
>
> *The nature of the Cash App platform was cited as an issue*. Users typically don't store money on the platform, and by the time Block employees were alerted to questionable transactions, the funds had already been transferred.
>
> *The limitations of the platform were fully transparent to the company's leadership*, *according to the former employee. An outside consultant's recent compliance analysis of Block was included in the documentation provided by the whistleblower. The survey identified over 50 deficiencies*.[25]

73.   These facts strongly suggest that Block's internal controls designed to ensure that the Company's financial products do not facilitate unlawful conduct and money laundering are materially deficient.   Moreover, the 2024 Proxy contains material omissions because it fails to include any detailed information about the Company's ERA program, what the Company's key enterprise risks are, how often the Audit & Risk Committee meets, and what if anything the Board is doing to address and mitigate such risks.

---

[25] *Id*.

Complaint for Violation of the Federal Proxy Laws

# V.    CLAIMS FOR RELIEF
## COUNT I
### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against All Defendants)

74.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

75.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

76.    Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2024 Proxy.  The 2024 Proxy contains proposals to Block's stockholders urging them to re-elect the members of the Board, approve executive compensation, and renew the contract of the Company's outside auditor.  The 2024 Proxy, however, misstates or fails to disclose the material information alleged *supra*.

Complaint for Violation of the Federal Proxy Laws

77.    By reasons of the conduct alleged herein, Defendants are in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of Defendants' wrongful conduct, Block is misleading or deceiving its stockholders by making misleading statements that are an essential link in stockholders heeding Block's recommendation to re-elect the current Board members up for election, approve the proposed executive compensation, and renew the contract of the outside auditor.

78.    Plaintiff thereby seeks injunctive and equitable relief because the conduct of the Individual Defendants is interfering with Plaintiff's voting rights and choices at the 2024 annual meeting.  Plaintiff does not seek any monetary damages for the proxy law violations.

79.    This action was timely commenced within three years of the date of the 2024 Proxy and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

**COUNT II**
**Declaratory and Injunctive Relief**
**(Against All Defendants)**

80.    Plaintiff incorporates by reference and re-alleges each of the foregoing allegations as though fully set forth in this paragraph.

81.    Plaintiff was and is a shareholder of Block, was a Block shareholder at the time of the 2024 Proxy and is entitled to vote on the matters contained in the proxy.

82.    The 2024 Proxy is false and misleading for the reasons alleged herein.

83.    The misrepresentations and omissions in the 2024 Proxy are material.

84.    Plaintiff seeks declaratory and injunctive relief, including a court order declaring the proxy to be false and misleading and ordering Defendants to issue a corrective proxy statement, invalidating the results of the 2024 annual meeting, and requiring Block to hold another meeting after dissemination of a corrective proxy.

Complaint for Violation of the Federal Proxy Laws

85.     There exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  Block has failed to notify its shareholders of the true facts, as alleged herein, and obtain action, including the election of directors and rejection of shareholder proposals, through the false proxy.

86.     A judicial declaration pursuant to 28 U.S.C. § 2201 and California Code of Civil Procedure § 1060 is necessary and appropriate at this time so that Plaintiff's rights as a shareholder of the Company may be determined with certainty.

87.     Accordingly, in connection with the active case and controversy between Plaintiff and Defendants, Plaintiff seeks declaratory relief under 28 U.S.C. § 2201 and California Code of Civil Procedure § 1060, declaring that:

  a.     Block's 2024 Proxy Statement is false and misleading;

  b.     The Proxy's discussion of the Company's Enterprise Risk Assessment program and the oversight role of the Audit & Risk Committee with respect to the ERA program is materially deficient;

  c.     The Proxy is materially deficient with respect to its discussion of the resignation of Director Summers from the Board;

  d.     Block's internal controls over the detection and prevention of unlawful conduct and money laundering are deficient; and

  e.     Block has a duty to immediately notify shareholders of the true facts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and against all Defendants as follows:

A.     Declaring that the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder;

B.     Declaring that Block's 2024 Proxy Statement is false and misleading;

Complaint for Violation of the Federal Proxy Laws

C.      Enjoining the 2024 Annual Meeting of Block's shareholders until such time as Block provides corrective disclosures to its shareholders;

D.      If the 2024 Annual Meeting is not enjoined beforehand, invalidating the results of the 2024 Annual Meeting and requiring Defendants to issue a corrective proxy statement and holding another election on the matters submitted to shareholders in the 2024 Proxy;

E.      Directing Block and the Individual Defendants to take all necessary actions to comply with applicable laws and to prevent the use of Cash App for unlawful purposes.

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  May 16, 2024                          Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)

s/ *Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
Email:    fbottini@bottinilaw.com
              achang@bottinilaw.com
              aarnzen@bottinilaw.com

*Attorneys for Plaintiff*

Complaint for Violation of the Federal Proxy Laws